# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| MARK A. ATKINSON,<br>　　　　　　　Plaintiff,<br><br>　　v.<br><br>TOWN OF ASHBURNHAM, et al.<br>　　　　　　　Defendants. | )<br>)<br>)<br>)<br>)<br>)　　**CIVIL ACTION**<br>)　　**NO. 4:16-cv-40168**<br>)<br>)<br>) |

## ORDER

### August 10, 2018

Hennessy, M.J.

This matter is before the court on Defendants Officer Kevin Kaddy ("Officer Kaddy")
and the Town of Ashburnham's (the "Town") motion for summary judgment. (Docket #21).
Plaintiff Mark A. Atkinson has filed an opposition. (Docket #27). This matter is now ripe for
adjudication. For the reasons that follow, the motion for summary judgment is ALLOWED.

## I.　BACKGROUND

On September 11, 2013, sisters Elizabeth Syvari and Barbara Atkinson co-owned
property located at 226 Ashby Road in Ashburnham, Massachusetts (the "Property"), which had
been deeded to them by their parents.[1] (PF 1-3). At this time, the Property was only open
seasonally, from May to September. (Docket #23-2 at 6-7). During the period leading up to
September 11, 2013, Ms. Syvari had occupied the Property as her personal residence to the

---

[1] The term "PF" refers to Plaintiff Mark A. Atkinson's Responses to Defendants' Facts and Additional Material
Facts which can be found in his Response to Defendants' Statement of Undisputed Material Facts in Support of
Defendants' Motion for Summary Judgment, and Plaintiff's Statement of Additional Material Facts. (Docket #28).
The term "DF" refers to the Defendants' facts which can be found in their Statement of Undisputed Material Fact in
Support of their Motion for Summary Judgment. (Docket #23).

exclusion of Ms. Atkinson and her family.  (PF 4).  Ms. Atkinson, her husband Mr. Atkinson, and Ms. Syvari had met on at least two occasions prior to September 11, 2013 to discuss the shared use of the Property.  (PF 5).  The parties could not reach an agreement, and as a result, Ms. Atkinson and Ms. Syvari's parents had requested Mr. Atkinson to further the conversation with Ms. Syvari.  (PF 6).

On the evening of September 11, 2013, Mr. Atkinson went to the Property to discuss issues surrounding its shared use with Ms. Syvari.  (PF 8).  Mr. Atkinson did not inform Ms. Syvari or Ms. Atkinson that he was going to the Property.  (DF 4-5).  Mr. Atkinson arrived at the Property around 6:25 pm, and when he pulled into the driveway, Ms. Syvari was sitting on the front porch eating dinner and drinking a beer.[2]  (PF 10).  Mr. Atkinson walked through the screen door of the porch and informed Ms. Syvari that "we need to get this resolved under the current conditions" and that her parents had requested he meet with her at the Property to resolve the issues.  (PF 12).  Ms. Syvari told Mr. Atkinson she did not wish to talk to him, and she stood up and walked through the right French door adjoining the porch, into the house.  (PF 13).

Mr. Atkinson walked through the left French door, which was open at the time, into the house, and he again requested a meeting with Ms. Syvari and the family to discuss the use of the Property.  (Docket #23-2 at 9, PF 14).  Ms. Syvari refused to speak with Mr. Atkinson, she grabbed her keys, walked out of the home, and got into her car and left.  (PF 15).  The entire conversation between Mr. Atkinson and Ms. Syvari occurred over three to four minutes and it never became physical, nor had any interaction between the two become physical in the past.  (PF 17-18).  Ms. Syvari initially went to her parents' home, but she left after her sister arrived.

---

[2] Ms. Syvari was "trying to deal with a migraine" although she never informed Mr. Atkinson that she had a migraine.  (PF 11).

(PF 20).  Ms. Syvari then "sat in the center of Ashburnham" and called her friend, Joel Kaddy, to discuss the interaction with Mr. Atkinson.  (Docket #28-1 at 8, Docket #23-4 at 6-7).

After the conversation with Ms. Syvari, Joel Kaddy, a retired police officer from the City of Fitchburg, went to the Ashburnham Police Department and requested to speak with his nephew, Officer Kaddy.[3]  (PF 23, 25).  Officer Kaddy met Joel and Jean Kaddy at Winchester Park in Ashburnham with Sergeant Conrad.  (Docket #23-3 at 5-6).  Joel Kaddy informed Officer Kaddy and Sergeant Conrad that Elizabeth Syvari had an "incident" at the Property with Mr. Atkinson and that he did not feel comfortable leaving town without notifying the police. (DF 17).  Sergeant Conrad and Officer Kaddy decided to go to the Property and interview Ms. Syvari.  (DF 18).  Ms. Syvari herself never contacted the Ashburnham Police Department following her conversation with Mr. Atkinson.  (PF 21).

At the time of these events, the Ashburnham Police Department followed "Domestic Violence Policy & Procedure No. 2.05" (the "Policy"), a set of guidelines that Ashburnham police officers are trained to observe when responding to calls involving domestic violence.  (PF 36-37).  Section B(2) of the Policy states that an officer, "[w]hile traveling to the scene of a domestic violence dispute … should request" the "existence of any warrant;" the "criminal history of the suspect;" the "existence of any protective orders against the suspect;" and "[a]ny other relevant information the department is aware of, especially regarding a history of incidents involving the particular address or the parties."  (Docket #26 at 30.)  According to Section B(7) of the Policy, when an officer arrives at the scene of a domestic dispute, the "responding officer(s) … should separate the parties to prevent any violent action."  (Id. at 31).  Then, "[i]n attempting to ascertain the facts of the dispute, the officers should allow each party to present his

---

[3] Joel Kaddy had known Mr. Atkinson for many years, and the two had been involved in a disagreement over a business issue many years ago.  (PF 24).

or her story individually." (Id.).  Section C of the Policy states, "Officers responding to domestic violence calls should conduct thorough investigations, including interviewing children, neighbors and other potential witnesses." (Id. at 31-32).  According to Section D of the Policy, "[w]hen assessing credibility in order to establish probable cause, officers should remember that a victim who is under the influence of drugs of alcohol, or who suffers from mental illness, is not an inherently unreliable witness." (Id. at 33).

When the officers arrived at the Property with Joel and Jean Kaddy to interview Ms. Syvari, they had yet to request any background information on Mr. Atkinson or the Property. (Docket #23-3 at 6, 9-10).  Mr. Atkinson was not at the Property when the officers arrived and he was never interviewed by police regarding his conversation with Ms. Syvari.  (Id. at 17-18).

According to Officer Kaddy, the interview with Ms. Syvari was initially difficult because she was hysterical and could "barely speak." (Id. at 6).  Ms. Syvari eventually told Officer Kaddy that "She was eating, got up, locked the door and [Mr. Atkinson] ran around the house. He came in through the back door.  Then she got hysterical and ran out the front door and left in her vehicle." (Id. at 7).  Additionally, Ms. Syvari told Officer Kaddy that she did not feel comfortable speaking to Mr. Atkinson, that Mr. Atkinson "frightens" her, and that she was afraid Mr. Atkinson would come back to the house that evening.  (Id. at 7, 9).  Officer Kaddy did not ask Ms. Syvari any questions regarding the content of the conversation between herself and Mr. Atkinson, including any words or statements that Mr. Atkinson may have said to Ms. Syvari. (PF 35).  Officer Kaddy did not ask Ms. Syvari why she was in fear of Mr. Atkinson but testified that he "didn't have to" because he "could see it on her face.  She was hysterical." (Docket #23-3 at 8).

During the interview, a neighbor entered the home to check on Ms. Syvari. (Id. at 7). Officer Kaddy did not interview the neighbor and testified that after the neighbor entered, Officer Kaddy "tried to take control of the situation" because Ms. Syvari became alarmed, jumped, and became hysterical. (Id.). Officer Kaddy did not ask Ms. Syvari whether she had consumed any alcohol, or whether she was suffering from any mental or medical conditions that evening. (PF 47). Officer Kaddy testified that Ms. Syvari did not smell like alcohol, that Ms. Syvari did not have slurred speech, and that he found Ms. Syvari to be a credible witness in her state. (Docket #23-3 at 19).

Based upon his interview with Ms. Syvari and his belief that she was placed in fear by Mr. Atkinson as a result of the incident between the two, Officer Kaddy determined that he had probable cause to arrest Mr. Atkinson for domestic assault. (DF 27). Officer Kaddy contacted the Fitchburg Police Department to request that Mr. Atkinson be placed under arrest. (PF 53).

The Fitchburg police arrived at Mr. Atkinson's home and informed him that they had received orders from the Ashburnham Police Department to place him under arrest. (PF 54). The Fitchburg officers then hand-cuffed Mr. Atkinson in front of his wife and placed him in the back of a police cruiser. (Id.). Mr. Atkinson was taken to the Fitchburg Police Department and confined to a holding cell for approximately two hours until officers from Ashburnham arrived to transport him. (PF 55). When he arrived at the Ashburnham Police Department, he was held in the garage area until he was booked. (PF 56). Mr. Atkinson was picked up by his wife and her parents at approximately 1 am. (Id.). He was given a police report before he left. (DF 37).

Officer Kaddy completed an application for a criminal complaint supported by his unsigned police report, which led to the issuance of a criminal complaint against Mr. Atkinson in

Winchendon District Court.[4]  (Docket #23-3 at 15, Docket #26 at 23-24).  The police report states that Ms. Syvari "recognized her brother [in-law], Mark Atkison [sic] pull into the driveway and then enter the porch area."  (Docket #26 at 23).  Further, the report indicates that Ms. Syvari "immediately told [Mr. Atkinson] to leave and that she did not wish to speak to him" and then she "got up from the table with her meal and entered into the home and closed and locked the door to the house."  (Id.).  The report goes on to state that:

> At this time Mark became angry and ran around the house and gained entry into the house through a door in the back.  Elizabeth stated that she panicked due to fear of his anger and fled the house out the front door and left the area in her vehicle. Elizabeth appeared visibly upset and was shaking at times and sobbing while she was speaking with me.

(Id.).  The report also discusses Ms. Syvari's hysterical reaction to the neighbor entering the house during her interview with Officer Kaddy.  (Id.).  The report explains that Officer Kaddy determined there was probable cause to arrest Mr. Atkinson for domestic assault because Mr. Atkinson "placed Elizabeth in fear" and "entered the house after she had asked him to leave." (Id.).  The police report does not contain any statements or threats that are attributable to Mr. Atkinson.  (PF 60-61).

The morning after the incident, Ms. Syvari appeared in Winchendon District Court for an abuse prevention order hearing against Mr. Atkinson.  (PF 63).  During the hearing, Ms. Syvari testified that Mr. Atkinson entered the porch and said, "We need to discuss this now," and in response she said, "I am not ready to discuss this.  I cannot discuss this."  (Docket #28-1 at 4). She then testified:

> I left the porch, I brought my supper into the house, and I did not feel comfortable.  I shut the door, and I locked it.  At that point, he ran through the other front – we have two open doors.  He ran through the other one and ran into the house.  At that time, I was really afraid of [sic] my physical well-being [.]

[4] Chief Loring H. Barrett, Jr. testified that reporting officers are not required to sign arrest reports.  (Docket #23-4 at 9).

(Id. at 6). During the hearing, Judge Haley asked Ms. Syvari if Mr. Atkinson ever threatened to harm her. (Id. at 8-9). She responded that Mr. Atkinson had sent her daughter "harmful texts … about payback" on the night of September 11, but did not respond to the question in relation to the in-person interaction between herself and Mr. Atkinson on September 11. (Id.). The judge declined to issue the restraining order based on the evidence given in court. (Id. at 12).

On February 4, 2014, Judge Haley allowed Mr. Atkinson's motion to dismiss the criminal complaint for lack of probable cause. (Docket #28-2 at 2, Docket #23-4 at 13). Following the filing of a motion for reconsideration on June 17, 2014, made on Chief Barrett's request, the Court affirmed the dismissal of the criminal complaint. (Id.). Mr. Atkinson incurred attorney's fees and lost income from missing several days of work to appear in Winchendon District Court to defend the criminal complaint. (PF 69).

## II.   STANDARD OF REVIEW

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Once a party has properly supported its motion for summary judgment, the burden shifts to the non-moving party, who "may not rest on mere allegations or denials of his pleading, but must set forth specific facts showing there is a genuine issue for trial." Barbour v. Dynamics Research Corp., 63 F.3d 32, 37 (1st Cir. 1995) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986)). Moreover, the Court is "obliged to []view the record in the light most favorable to the nonmoving party, and to draw all reasonable inferences in the nonmoving party's favor." LeBlanc v. Great Am. Ins. Co., 6 F.3d 836, 841 (1st Cir. 1993). Even so, the Court is to ignore "conclusory allegations, improbable inferences, and unsupported speculation." Sullivan v. City of Springfield, 561 F.3d 7, 14 (1st Cir. 2009) (quotation omitted).

III.    ANALYSIS

Defendants seek summary judgment on all counts of Mr. Atkinson's Complaint: (I) false imprisonment against Officer Kaddy; (II) negligence against the Town under M.G.L.c. 258; (III) abuse of process against Officer Kaddy (IV) violation of the Massachusetts Civil Rights Act against Officer Kaddy; and (V) deprivation of civil rights against Officer Kaddy and the Town under 42 U.S.C. § 1983.

A.    Qualified Immunity

Defendants assert that counts IV and V against Officer Kaddy should be dismissed because he is entitled to qualified immunity.  (Docket #22 at 15-17, 20-21).  Qualified immunity protects police officers "from liability for civil damages insofar as their conduct does not violate clearly establish statutory or constitutional rights of which a reasonable person would have known."  Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).  The doctrine provides public officials "breathing room to make reasonable but mistaken judgments about open legal questions."  Ashcroft v. al-Kidd, 563 U.S. 731, 743 (2011).  "When properly applied, it protects 'all but the plainly incompetent or those who knowingly violate the law.'"  Id.  (quoting Malley v. Briggs, 475 U.S. 335, 341 (1986)).  However, "qualified immunity does not shield public officials who, from an objective standpoint, should have known that their conduct was unlawful."  Haley v. City of Boston, 657 F.3d 39, 47 (1st Cir. 2011) (internal quotations and citations omitted).

Courts use a two-part test to determine whether qualified immunity applies: the court must determine (1) whether the facts alleged by the plaintiff make out a violation of a constitutional right; and if so, (2) whether the right was clearly established at the time of the alleged violation.  MacDonald v. Town of Eastham, 745 F.3d 8, 12 (1st Cir. 2014).  Under the second prong of the test, the analysis involves two questions: (1) whether the legal contours of

the constitutional right were sufficiently clear; and (2) whether, in the specific factual context of the case, the violation would have been clear to a reasonable official.  Id.

> [A] defendant cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it.  In other words, "existing precedent must have placed the statutory or constitutional question" confronted by the official "beyond debate."

Plumhoff v. Rickard, 134 S. Ct. 2012, 2023 (2014) (quoting al-Kidd, 563 U.S. at 741).

　　1.  Violation of a Constitutional Right

　　A.  Probable Cause

Turning to the first part of the qualified immunity test, "[t]he Fourth Amendment protects 'the right of the people to be secure in their persons … against unreasonable searches and seizures.'"  District of Columbia v. Wesby, 138 S. Ct. 577, 585 (2018) (quoting U.S. CONST. amend. IV).  "Because arrests are 'seizures' of 'persons,' they must be reasonable under the circumstances."  Id.  "[A] warrantless arrest by a law officer is reasonable under the Fourth Amendment where there is probable cause to believe that a criminal offense has been or is being committed."  Devenpeck v. Alford, 543 U.S. 146, 152 (2004).  The central allegation of Mr. Atkinson's complaint is that he was arrested without probable cause, which, if proven, would constitute a constitutional violation.

The Police charged Atkinson with the crime of assault.  "Under the common law, an assault may be accomplished in one of two ways -- either by an attempted battery, or by putting another in fear of an immediately threatened battery."  Commonwealth v. Gorassi, 432 Mass. 244, 247 (2000).  "Thus, an assault is defined as either an attempt to use physical force on another, or as a threat of use of physical force."  Id. at 247-48.  The record here demonstrates that Officer Kaddy reasonably believed Ms. Syvari was placed in fear of an immediate battery by Mr.

Atkinson and therefore, that there was probable cause to arrest Mr. Atkinson for domestic assault.

To determine whether an officer had probable cause for an arrest, the court "examine[s] the events leading up to the arrest, and then decide[s] 'whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to' probable cause." Maryland v. Pringle, 540 U.S. 366, 371 (2003) (quoting Ornelas v. United States, 517 U.S. 690, 696 (1996)). "Probable cause is evaluated as of the moment an arrest is made, based on the facts and circumstances within the arresting officer's knowledge and of which he had reasonably trustworthy information." Nuon v. City of Lowell, 768 F. Supp. 2d 323, 330 (D. Mass. 2011). "Probable cause exists when police officers, relying on reasonably trustworthy facts and circumstances, have information upon which a reasonably prudent person would believe the suspect had committed or was committing a crime." United States v. Jones, 432 F.3d 34, 41 (1st Cir. 2005) (quoting United States v. Young, 105 F.3d 1, 6 (1st Cir. 1997)). "If reasonable grounds to arrest exist, probable cause is established and there is no further duty to investigate." Sietins v. Joseph, 238 F. Supp. 2d 366, 375 (D. Mass. 2003) (quoting White v. Town of Marblehead, 989 F. Supp. 345, 349 (D. Mass. 1997)). Provided that "the presence of probable cause … is at least arguable," the defendant officer is entitled to qualified immunity. Nuon, 768 F. Supp. 2d at 333 (citing Anderson v. Creighton, 483 U.S. 635, 641 (1987)).

Officer Kaddy's determination of probable cause was based on his observations and the information provided to him by Ms. Syvari. Officer Kaddy testified that Ms. Syvari clearly exhibited signs of fear during the interview - she was hysterical and could barely speak. She expressly told Officer Kaddy that she was in fear of Mr. Atkinson and that she was afraid he would return to the Property that evening. She stated that she had locked the door to the home

but that Mr. Atkinson entered the home through an unlocked back entrance, without being invited in. Ms. Syvari told Officer Kaddy that she feared for her safety and fled the home. While the police were interviewing Ms. Syvari, a neighbor entered the home. Ms. Syvari became alarmed, jumped, and became hysterical. After speaking with the victim and observing her behaviors, Officer Kaddy reasonably determined Ms. Syvari was in fear of harm by Mr. Atkinson and that probable cause existed to arrest Mr. Atkinson for domestic assault.

In his opposition, Mr. Atkinson contends that Officer Kaddy's report lacks evidence to support a finding of probable cause because it contains false statements. (Docket #27 at 8). He highlights the fact that Ms. Syvari contradicted her assertion to Officer Kaddy that "plaintiff became angry and ran around the house and entered through a back door" the following day when she testified in front of the Winchendon Court, (id.), stating instead that "he ran through the other one [front door] and ran into the house," (Docket #28-1 at 6). Assuming this inconsistency and its import, Ms. Syvari's later testimony does not negate Officer Kaddy's initial finding of probable cause at the time of arrest. See White, 989 F. Supp. at 350 ("While in this case, the victim's version ultimately proved to be unreliable, permitting the police to rely on a victim's credible statement in order to determine probable cause is critical."). Rather, probable cause must be evaluated at the time the arrest was made. Nuon, 768 F. Supp. 2d at 330. Accordingly Ms. Syvari's credible statement supporting probable cause is not undermined by an apparent subsequent inconsistency.

Additionally, Mr. Atkinson argues that Ms. Syvari's statements to Officer Kaddy did not constitute sufficient probable cause because her account was uncorroborated. (Docket #27 at 9-10). "The uncorroborated testimony of a victim or other percipient witness, standing alone, ordinarily can support a finding of probable cause." Acosta v. Ames Dept. Stores, Inc., 386 F.3d

5, 10 (1st Cir. 2004). The primary inquiry when probable cause is claimed to be insufficient because of an uncorroborated victim account is "whether there is any evidence that the officers acted unreasonably when they determined that [the alleged victim's] accusation was credible, in light of all the circumstances known at the time." Forest v. Pawtucket Police Dept., 377 F.3d 52, 57 (1st Cir. 2004). In B.C.R. Transport Co. v. Fontaine, the First Circuit found that the fact that police officers were acting on information provided by an alleged victim did not preclude the jury from finding a lack of probable cause. B.C.R. Transport Co. v. Fontaine, 727 F.2d 7, 10 (1st Cir. 1984) (holding that "whether or not probable cause exists in any given case invariably depends on the particular facts and circumstances of that case, a question to be resolved by the trier of fact."). The alleged victim was "a drifter who had behaved incoherently while in police custody" and the officers observed that the individual was "affected by some kind of mind-altering substance." Id. at 9-10. Although Mr. Atkinson attempts to paint Ms. Syvari as an unreliable witness, possibly suffering from mental issues or under the influence of alcohol, Officer Kaddy testified that he believed Ms. Syvari to be a credible witness. [5] Officer Kaddy stated that he did not see any signs of impairment during the interview, and that he would have known if she was doing drugs or was drinking alcohol based on her appearance.[6] Under the circumstances, Officer Kaddy had a reasonable basis for believing Ms. Syvari was a coherent witness, and her testimony was sufficiently credible to establish probable cause.

Regardless, the First Circuit found that "[t]he outcome in B.C.R. Transport represented the exception, not the rule" and when the "material facts … are not in dispute … the existence …

---

[5] Mr. Atkinson claims that Defendants violated Section D of the Policy by not asking Ms. Syvari whether she had consumed any alcohol or was suffering from any mental or medical condition. (Docket #27 at 12). Yet Section D does not create any affirmative duty on the part of the officer to ask the witness whether they had been drinking or suffering from health issues. (See Docket #26 at 33-34).

[6] Additionally, although she did not seem to be under the influence of drugs or alcohol, according to the Policy, "a victim who is under the influence of drugs or alcohol, or who suffers from mental illness, is not an inherently unreliable witness." (Docket #26 at 33).

of probable cause ordinarily is amenable to summary judgment." <u>Acosta</u>, 386 F.3d at 8-9. The court explained that the material facts in these inquiries are "what the police knew at the moment of the arrest, the source of their knowledge, and the leads that they pursued or eschewed." <u>Id.</u> at 9. None of these facts are in dispute in this case.

Based on the foregoing analysis, I find that, as a result of his interview with and observations of Ms. Syvari, Officer Kaddy had probable cause to arrest Mr. Atkinson for domestic assault. Therefore, the arrest did not violate Mr. Atkinson's Fourth Amendment rights.

B. Violation of the Policy

In his opposition, Mr. Atkinson asserts that Officer Kaddy is not entitled to qualified immunity because he failed to follow the Policy. (Docket #27 at 10-13). Relying on <u>Goodhile v. Gribbons</u> 186 F. Supp. 3d 4 (D. Mass. 2016), Mr. Atkinson argues that Officer Kaddy's violation of the Policy is evidence of an unreasonable probable cause determination, and therefore, evidence of a violation of his constitutional rights. (Docket #27 at 10). In <u>Goodhile</u>, the First Circuit found that the defendant town's police department's use-of-force policy provided a framework within which a jury could find that the defendant police officer's actions exceeded what was reasonable under the circumstances. <u>Goodhile</u>, 186 F. Supp. 3d at 12. However, even using the Policy as a framework to assess probable cause, Officer Kaddy's actions did not violate Mr. Atkinson's constitutional rights.

The language in the Policy is suggestive rather than mandatory. The relevant parts of the Policy state: "[w]hile traveling to the scene of a domestic violence dispute, the officers *should* request …" background information; "[i]n attempting to ascertain the facts of the dispute, the officers *should* allow each party to present his or her story …"; "Officers responding to domestic violence calls *should* conduct thorough investigations, including interviewing children,

neighbors and other potential witnesses." (Docket #26 at 30-32) (emphasis added). Further, Chief Barret testified that the Policy is composed of "suggested guidelines" officers are trained on and "depending on discretionary issues, depending on circumstances, [the officers] could vary off them." (Docket #23-4 at 5). Therefore, even though Officer Kaddy did not follow the suggested guidelines of the Policy, that should not function as per se evidence of an unreasonable determination of probable cause and defeat the claim of qualified immunity. Cf. Cinelli v. Cutillo, 896 F.2d 650, 655 (1st Cir. 1990) (holding that, due to the existence of a police policy stating that "no officer shall in any way … attempt to improperly require a subject to relinquish his rights," the officers knew or should have known that their statements attempting to coerce plaintiff into relinquishing his right to an attorney were unreasonable and in violation of defendant's constitutional rights). In the circumstances under which he was operating, namely a purported domestic violence dispute where the alleged perpetrator was no longer in the vicinity and there was no reports of witnesses to the incident other than the two parties directly involved, the court finds that Officer Kaddy's failure to follow the Policy guidelines was not unreasonable.

Based on the foregoing analysis, Officer Kaddy is entitled to qualified immunity despite his failure to follow Policy guidelines.

2. Clearly Established Right

"If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity." Saucier v. Katz, 533 U.S. 194, 201 (2001). Here, because the arrest did not violate Mr. Atkinson's Fourth Amendment rights, there is no constitutional violation and Officer Kaddy is entitled to qualified immunity.

B.     Count I: False Arrest against Officer Kaddy

"False arrest is a species of the tort of false imprisonment." <u>Nuon</u>, 768 F. Supp. 2d at 336.  "The tort of false imprisonment consists of the (1) intentional and (2) unlawful (3) confinement of a person, (4) directly or indirectly (5) of which the person confined is conscious or is harmed by such confinement." <u>Id.</u>  "Police officers may be liable for this tort 'unless the police officer had a legal justification' for the restraint." <u>Sietins</u>, 238 F. Supp. 2d at 381 (quoting <u>Rose v. Town of Concord</u>, 971 F. Supp. 47, 51 (D. Mass. 1997)).  "Such justification exists if the officer had probable cause to arrest the suspect." <u>Id.</u>  Here, as stated above, Officer Kaddy had probable cause to arrest Mr. Atkinson, and therefore, Officer Kaddy is not liable for the tort of false arrest because he had a legal justification for the restraint.  Therefore, the Court grants summary judgment for Officer Kaddy on count I of the complaint.

C.     Count II: Negligence against Town of Ashburnham

As an initial matter, municipalities may be sued under the Massachusetts Torts Claims Act ("MTCA") only "where the municipality knew or should have known about an underlying, identifiable tort which was committed by named or unnamed public employees." <u>Kennedy v. Town of Billerica</u>, 617 F.3d 520, 533 (1st Cir. 2010) (citing M.G.L.c. 258 § 2, 10(c).)

In his opposition, Mr. Atkinson claims that the Town is subject to liability under the MTCA due to Office Kaddy's and the police department's violation of the Policy.  (Docket #27 at 14-15).  Mr. Atkinson relies on <u>Lewis v. Kendrick</u>, where the First Circuit found the defendant city liable under the MTCA for an officer's violation of a police policy that called for "the immediate sending of a supervisor to the scene in case of a report of a serious crime." <u>Lewis v. Kendrick</u>, 944 F.2d 949, 953 (1st Cir. 1991).  The court determined that, based on the "scant evidence of police training … with respect to constitutional rights, warrantless arrests, and

probable cause," a jury could conclude that the defendant city was liable for the officer's failure to comply with the police policy. Id. Lewis is not relevant to this case.

Here, unlike Lewis, the police department did not violate the Policy as Mr. Atkinson claims they did. Mr. Atkinson alleges that the police department violated Section K of the Policy. (Docket #27 at 12). Section K states that "arrest reports will be carefully reviewed by a supervisor … preferably one who is specially trained to review domestic violence cases, in order to ensure that … these guidelines are met." (Docket #26 at 40). Officer Kaddy and Chief Barrett testified that Lieutenant Todd Parsons, who was specially trained to review domestic violence cases, reviewed and approved of the report. (Docket #23-3 at 19, Docket #23-4 at 9, 12).[7] Additionally, Mr. Atkinson does not allege any lack of training of police officers contributing to the Town's liability. Therefore, I find the Town is not subject to liability for the police department's alleged violation of section K of the Policy.

Mr. Atkinson also asserts that the Town is subject to liability under the MTCA due to the negligent conduct of Officer Kaddy in arresting Mr. Atkinson without probable cause. (Docket #27 at 15). Although I have already found that probable cause supported Mr. Atkinson's arrest, even if I found Officer Kaddy arrested Mr. Atkinson without probable cause, the Town would not be subject to liability. According to M.G.L.c. 258 § 10(b), municipalities are immune from liability for a claim based on the performance, or nonperformance, of "a discretionary function or duty on the part of a public employer or public employee, acting within the scope of his office or employment." Whether the public employee's conduct is a discretionary function, and thus exempt from liability, requires a two-step analysis. Harry Stoller & Co. v. Lowell, 412 Mass. 139, 141 (1992).

---

[7] Lieutenant Todd Parsons was the supervising officer at the time the incident occurred and the police report was created. (Docket #23-4 at 12).

The first step involves determining "whether the [governmental] actor had any discretion to do or not to do what the plaintiff claims caused him harm." Id. If a statute, regulation, or established agency practice prescribes a course of action, the defendant's conduct is not protected by the discretionary function exception. Id. At the second step the court must decide whether that discretion is the kind afforded immunity from liability under M.G.L.c. 258, § 10(b). Harry Stoller & Co., 412 Mass. at 141. This second step requires a determination as to whether the discretionary conduct involved policy making or planning. Id. "[T]he appropriate dividing line falls between those functions which rest on the exercise of judgment and discretion and represent planning and policymaking and those functions which involve the implementation and execution of such governmental policy or planning." Whitney v. Worcester, 373 Mass. 208, 217 (1977). "Discretionary functions include specific, individual applications of policy, 'those decisions in which a government official determines what action to take based on an individual, case-by-case analysis and in which his decision includes elements of judgment and discretion.'" Horta v. Sullivan, 4 F.3d 2, 18 (1st Cir. 1993) (quoting Pina v. Commonwealth, 400 Mass. 408, 415 (1987)) (alterations omitted).

In relation to police officers, the First Circuit has held that the Commonwealth has a clear policy for enforcement of the laws by police officers. Horta, 4 F.3d at 19. Therefore, the decision of a police officer to enforce the law in a specific way is a decision based on policy considerations and is protected under M.G.L.c. 258 10(b) as a discretionary function. See Sena v. Commonwealth, 417 Mass. 250, 256 (1994) ("The decisions of law enforcement officers regarding whether, when, how, and whom to investigate, and whether and when to seek warrants for arrest are based on considerations of, and necessarily affect, public policy. So long as they are within the bounds of the law, and therefore within the officers' discretion, they are public

policy decisions."). Therefore, Officer Kaddy's decision to arrest Mr. Atkinson was a discretionary decision. I find that the Town is immune from liability for Officer Kaddy's conduct in investigating Ms. Syvari's claims and decision to arrest Mr. Atkinson under the discretionary function exemption. See M.G.L.c. 258 § 10(b).

As Mr. Atkinson has failed to demonstrate a claim of negligence against the Town, the Court grants summary judgment to the Town on count II of the complaint.

D.     Count III: Abuse of Process against Officer Kaddy

To prevail on an abuse of process claim, a plaintiff must demonstrate "that process was used 'to accomplish some ulterior purpose for which it was not designed or intended, or which was not the legitimate purpose of the particular process employed.'" Millennium Equity Holdings, LLC v. Mahlowitz, 456 Mass. 627, 636 (2010) (quoting Quaranto v. Silverman, 345 Mass. 423, 426 (1963)). "The elements of an abuse of process claim are that: (1) 'process' was used; (2) for an ulterior or illegitimate purpose; (3) resulting in damage." Gutierrez v. Mass. Bay Transp. Auth., 437 Mass. 396, 407 (2002) (internal quotation omitted). "[A]n improper motive of 'vexation, harassment, or annoyance' is relevant but does not alone suffice to demonstrate ulterior purpose." Empire Today, LLC v. Nat'l Floors Direct, Inc., 788 F. Supp. 2d 7, 23 (D. Mass. 2011) (quoting Psy-Ed Corp. v. Klein, 459 Mass. 697, 713 (2011)). "An ulterior purpose 'is not simply the intent to harm the other party directly by bringing the suit.'" Id. (quoting Psy-Ed, 459 Mass. at 713 n. 35). "Rather, the ulterior purpose must be to gain some collateral advantage." Psy-Ed, 459 Mass. at 713-14.

Here, I find Mr. Atkinson has failed to make out a claim against Officer Kaddy for abuse of process. Mr. Atkinson's opposition does not allege any ulterior purpose or motive by Officer Kaddy in his investigation and arrest of Mr. Atkinson, nor is there any evidence that Officer

Kaddy sought to gain any collateral advantage by Mr. Atkinson's arrest. Officer Kaddy had never met Mr. Atkinson and did not know the victim, Ms. Syvari, before September 11, 2013. Therefore, the count grants summary judgment to Officer Kaddy on count III of the complaint.

E.     Count IV: Massachusetts State Civil Rights Act against Officer Kaddy

To prevail under the Massachusetts Civil Rights Act ("MCRA"), the plaintiff "must prove that (1) his exercise or enjoyment of rights secured by the Constitution or laws of either the United States or of the Commonwealth (2) has been interfered with, or attempted to be interfered with, and (3) that the interference or attempted interference was by threats, intimidation or coercion." Sheppard v. Aloisi, 384 F. Supp. 2d 478, 494 (D. Mass. 2005) (quoting Bally v. Northeastern Univ., 403 Mass. 713, 717 (1989)). For the purposes of the MCRA, Massachusetts courts have defined threats, intimidation, or coercion as follows:

> a "threat" consists of "the intentional exertion of pressure to make another fearful or apprehensive of injury or harm;" "intimidation" involves "putting in fear for the purpose of compelling or deterring conduct;" and "coercion" is "the application to another of such force, either physical or moral, as to constrain him to do against his will something he would not otherwise have done."

Glovsky v. Roche Bros. Supermarkets, Inc., 469 Mass. 752, 762-63 (2014) (quoting Haufler v. Zotos, 446 Mass. 489, 505 (2006)). "A direct violation of civil rights is not, without a showing of coercive behavior actionable." Sietins, 238 F. Supp. 2d at 378 (quoting Britton v. Maloney, 901 F. Supp. 444, 453 (D. Mass. 1995)). The courts "employ a reasonable person standard in determining whether a defendant's conduct constitutes such threats, intimidation, or coercion." Id. at 763.

Mr. Atkinson fails to identify the "threats, intimidation or coercion" employed by Officer Kaddy. According to Mr. Atkinson, Officer Kaddy and Mr. Atkinson never interacted; Officer Kaddy had never met Mr. Atkinson prior to arrest, he didn't interview him, and he did not appear

at Mr. Atkinson's home for the arrest. Officer Kaddy was not present at the Ashburnham Police Department when Mr. Atkinson was brought in and Officer Kaddy did not book Mr. Atkinson or otherwise speak with Mr. Atkinson while detained. To the extent Mr. Atkinson argues the coercive conduct was the arrest itself, he must demonstrate that the arrest "accomplished, contributed to or was directed at an[] unlawful end." Id. (quotation omitted). Mr. Atkinson has failed to do so. Therefore, I find that Mr. Atkinson has failed to demonstrate the requisite threats, intimidation, or coercion required under the MCRA.

Further, the Massachusetts Supreme Judicial Court has held that MCRA claims are subject to the same standard of qualified immunity for police officers that applies to § 1983 claims. See Raiche v. Pietroski, 623 F.3d 30, 40 (1st Cir. 2010) (citing Duarte v. Healy, 405 Mass. 43, 46 (1989)). Thus, Mr. Atkinson's MCRA claim is necessarily precluded because I have already determined that Officer Kaddy is protected by qualified immunity. See Meagher v. Andover Sch. Comm., 94 F. Supp. 3d 21, 44-45 (D. Mass. 2015) (concluding that because defendant officer was entitled to qualified immunity, defendant was also immune from MCRA claim); Stull v. Town of Weymouth, No. 11-11549-JLT, 2013 U.S. Dist. LEXIS 146058, at *20 (D. Mass. Oct. 9, 2013) ("Because the Officer Defendants are entitled to qualified immunity for Plaintiff's § 1983 claims, they are also immune to Plaintiff's MCRA claims.") (footnote omitted). For the foregoing reasons, the court grants summary judgment to Officer Kaddy on count IV of the complaint.

F.    Count V: 42 U.S.C. § 1983

A municipality may "be sued directly if it alleged to have caused a constitutional tort through 'a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers.'"   St. Louis v. Praprotnik, 485 U.S. 112, 121 (1988)

(quoting Monell v. New York City Dept. of Soc. Servs., 436 U.S. 658, 690 (1978)). The Supreme Court has "rejected the use of the doctrine of respondeat superior" under § 1983 and "concluded that municipalities could be held liable only when an injury was inflicted by a government's lawmakers or by those whose edicts or acts may fairly be said to represent official policy." Id. (internal quotation omitted). The plaintiff must "demonstrate both the existence of a policy or custom and a causal link between that policy and the constitutional harm." Santiago v. Fenton, 891 F.2d 373, 381 (1st Cir. 1989) (citing City of Canton, Ohio v. Harris, 489 U.S. 378, 385 (1989)). Where an official policy is not identified by a plaintiff, liability may arise if the plaintiff can prove that an informal policy is "so permanent and well settled as to constitute a custom or usage with the force of law." Praprotnik, 485 U.S. at 127 (quotation omitted). The First Circuit has found that uncontradicted testimonial evidence from police officers of longstanding, wide-spread practice proves the existence of a custom or usage. Bordanaro v. McLeod, 871 F.2d 1151, 1156 (1st Cir. 1989).

Mr. Atkinson has failed to state a claim against the Town for constitutional violations under § 1983. First, Mr. Atkinson fails to identity any official municipal policy that caused a violation of his constitutional rights. Second, Mr. Atkinson fails to identify a "custom or usage" in the Ashburnham Police Department of arresting individuals without probable cause. Instead, Mr. Atkinson attempts to connect the alleged misconduct of Officer Kaddy to the Town in order to hold the Town liable on a theory of *respondeat superior*, which fails as a matter of law. See Praprotnik, 485 U.S. at 121. The court grants summary judgment to the Town on count V of the complaint.

Officer Kaddy is protected by qualified immunity and therefore, protected from civil liability under § 1983. The court grants summary judgment to Officer Kaddy on count V of the complaint.

IV.     CONCLUSION

For the foregoing reasons, the Defendants' motion for summary judgment (Docket #21) is hereby ALLOWED.


/s/ David H. Hennessy
David H. Hennessy
United States Magistrate Judge